IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MICHAEL BEASLEY,                        )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )      No. 12 C 8715
                                        )
JOHN WILEY & SONS, INC.,                )
                                        )
            Defendant.                  )

**MEMORANDUM OPINION**

Before the court are several motions. For the reasons explained below, plaintiff's motion for summary judgment of liability on Count I is granted; defendant's motion for summary judgment on Counts II and III is entered and continued; and plaintiff's motion to challenge defendant's confidentiality designations is denied as moot.

**BACKGROUND**

Plaintiff, Michael Beasley, is a professional photographer who licenses his images to various publishers, including defendant John Wiley & Sons, Inc. ("Wiley"). Beasley's licensing agent for the relevant photos was Odyssey Productions, Inc. ("Odyssey"), a stock photography licensing agency, which is not a party to this action.

The facts are largely undisputed. In July 2005, Matthew Kiernan, a Wiley representative, sent Odyssey an e-mail on behalf of Richard Fox, a senior photo editor at Wiley. The e-mail

explained that Wiley sought to license a number of photographic images of locations in Chicago for a new Wiley travel guidebook titled "Frommer's Chicago Day by Day." (Pl.'s Reply, Ex. 1, Decl. of Jennifer Johnson, Ex. B.) During the next few months, Odyssey and Wiley exchanged e-mails regarding particular photos that Wiley needed. (Decl. of Christopher P. Beall, Ex. B.) In December 2005, Odyssey and Wiley communicated further about the photos and negotiated the terms of the copyright license. On December 19, 2005, Odyssey issued a $7,500.00 invoice (the "Invoice") to Wiley for a nonexclusive license to use 31 of Beasley's photos (along with 5 photos created by other photographers) in Wiley's guidebook. Under the heading "Usage Rights Granted," the Invoice states:

> One time nonexclusive print rights, John Wiley & Sons Inc, Frommer's "Chicago Day by Day" 1st Edition, English language only, up to 46,000 total press run, published May 2006, World rights (defined as: USA plus 10% English language countries), six years. No electronic rights.

(Decl. of Michael Beasley, Ex. A, Invoice.) Wiley paid the invoice in January 2006.

In May 2006, Wiley published the first edition of <u>Frommer's Chicago Day by Day</u> ("<u>Chicago Day by Day</u>") in a printed-book format that contained 29 of Beasley's photos. From May 2007 through July 2011, Wiley offered a electronic version of the book on Amazon.com; another electronic version of the book was offered through other vendors until July 2011. In May 2009, Wiley published a second edition of <u>Chicago Day by Day</u>, which contained 27 of Beasley's

photos. An electronic version of the second edition was also offered beginning in May 2009.

It is undisputed that Wiley printed 75,938 copies of <u>Chicago Day by Day</u> (total, across the two editions). Wiley maintains that although it *printed* this many copies, it actually *distributed* fewer copies--just over 55,000, and that it distributed less than 46,000 copies of the first edition. It is undisputed that Wiley distributed 42 electronic copies of the first edition and 16 electronic copies of the second edition.

Wiley had never sought to renew the license or to obtain permission to use Beasley's photos beyond the scope of the license. On October 31, 2012, Beasley filed this action. He alleges that Wiley's use of his photographs exceeded the terms of the limited license. The complaint contains three counts. Count I alleges that Wiley infringed Beasley's copyrights in the photos. Count II alleges common-law fraud in that when Wiley obtained the license, it "intentionally misrepresented the format in which the [p]hotographs would be reproduced, intending that Odyssey would rely upon that misrepresentation to its detriment by charging a lower fee and to Wiley's gain by paying less than it would have paid if it had been honest." (Compl. ¶ 11.) In Count III, plaintiff alleges that Wiley violated the Digital Millennium Copyright Act (the "DMCA"), 17 U.S.C. § 1202 <u>et seq.</u>, by intentionally removing copyright-management information from

Beasley's photos in order to "induce, enable, facilitate or conceal its copyright infringements." (Compl. ¶ 32.) Beasley seeks an order permanently enjoining defendant from further infringement, the impoundment of all copies of his photos in Wiley's possession, either actual or statutory damages, an award of attorney's fees and costs in relation to the DMCA claim, and punitive damages.

Beasley moves for summary judgment of liability on Count I, the copyright infringement claim.[1] Wiley moves for summary judgment on Counts II and III, the fraud and DMCA claims. Also pending is Beasley's motion to provisionally file certain documents Wiley designated as confidential; Beasley challenges Wiley's designation.

## DISCUSSION

## A. Plaintiff's Motion for Summary Judgment on Count I

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "The court need consider only the cited materials, but it may consider other

---

[1] Plaintiff has requested oral argument on this motion. After reviewing the briefs, we do not believe that oral argument will materially add to our understanding of the issues. The request is denied.

materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

Count I is a claim for copyright infringement. The Copyright Act grants copyright owners certain exclusive rights in their copyrighted works, including the exclusive rights to reproduce and distribute copies of the work. 17 U.S.C. § 106(1), (3). A plaintiff claiming copyright infringement must establish two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Janky v. Lake County Convention & Visitors Bureau, 576 F.3d 356, 361 (7th Cir. 2009) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991)). "Where the plaintiff has granted the defendant a license, to establish the second element, the plaintiff must demonstrate that the license was limited in scope and that the scope of the license has been exceeded." Bergt v. McDougal Littell, 661 F. Supp. 2d 916, 921 (N.D. Ill. 2009); see also

_ITOFCA, Inc. v. MegaTrans Logistics, Inc._, 322 F.3d 928, 940 (7th Cir. 2003) (Ripple, J., concurring) ("A licensee infringes the owner's copyright if its use exceeds the scope of its license.").

### 1.   Scope of the Copyright License

The first element that Beasley must establish, ownership of valid copyrights in the photographs at issue, is undisputed. (Def.'s Resp. to Pl.'s Rule 56.1 Statement, ¶¶ 6-7.)  It is also undisputed that Wiley had a nonexclusive license to use the photos. Wiley submits, however, that the scope of the license is at issue. Beasley contends that the terms of the license agreement are set out solely in the Invoice that Odyssey sent to Wiley and Wiley paid.  Wiley argues that the Invoice is "ambiguous" with respect to its right to print a second edition of _Chicago Day by Day_ incorporating Beasley's photos and that "there is simply no single document signed by both Odyssey . . . and Wiley that governs the scope of Wiley's authorized use of the photos."  (Def.'s Mem. in Opp'n to Pl.'s Mot. at 8, 5.)  According to Wiley, where, as here, the parties operated as though they had reached a license agreement, the terms of that agreement "may be construed from the letters and writings between the parties."  (Def.'s Mem. in Opp'n to Pl.'s Mot. at 5 (internal quotation marks and brackets omitted).)

"Normal rules of contract construction are generally applied in construing copyright agreements."  _Kennedy v. Nat'l Juvenile_

<u>Det. Ass'n</u>, 187 F.3d 690, 694 (7th Cir. 1999). "As a general rule, a contract need not be contained in a single writing; it may be collected from several different writings which do not conflict with each other and which, when connected, show the parties, subject matter, terms, and consideration. Generally, a contract is operative as such from the time when there is a meeting of the minds . . . ." <u>O'Brien v. Kawazoye</u>, 327 N.E.2d 236, 240-41 (Ill. App. Ct. 1975) (citation omitted).[2]

The invoice that Odyssey sent to Wiley, and which Wiley subsequently paid with evidently no further discussion about the terms of the license, states in pertinent part as follows:

> **Invoice # 765174     Invoice Date: December 19 2005**
>
> **Project Title: Chicago Day by Day 1**
>
> **License Start Date: Dec 19, 2005**
>
> **License End Date: Dec 19, 2011**
>
> **Length of Run: 6 years**
>
> **Maximum Circulation/Press Run: 46,000**
>
> **Territory: World**
>
> **Usage Rights Granted**
>
> One time nonexclusive print rights, John Wiley & Sons Inc, Frommer's "Chicago Day by Day" 1st Edition, English language only, up to 46,000 total press run, published May 2006, World rights (defined as: USA plus 10% English language countries), six years.  No electronic rights.
>
> Base price, -25% special quantity discount

[2] Wiley contends that Illinois's rules of contract interpretation apply to the parties' license agreement.  Beasley does not argue otherwise.  We will apply Illinois law.  <u>See</u> <u>Bergt v. McDougal Littell</u>, No. 06 C 4645, 2006 WL 3782919, at *2 n.1 (N.D. Ill. Dec. 21, 2006) (applying the law of the state in which the federal court sits where neither party raised a conflict of law issue).

(Beasley Decl., Ex. A, Invoice.)  The Invoice went on to list the specific licensed images.[3]

Wiley relies on a December 19, 2005 series of e-mails between it and Odyssey that occurred just prior to Odyssey's issuing the Invoice.  Richard Fox of Wiley e-mailed Jerry Philip of Odyssey, using the subject line "Frommer's Chicago Day by Day 1st Edition-- Photo Usage Negotiations" and stating in relevant part as follows:

> Hello Jerry,
>
> Could you do me a small favor and forward this excel file to Robert Frerck?  He was anxious to get the usage fees invoiced, and I too am sensitive to this issue, so I expedited what I could.
>
> Robert--
>
> Please review the attached excel file.  We are using 37 images, as far as I know. . . . I need the prices to be:
> 1/4 Page = $200
> 1/2 Page = $250
> Full Page = $300

---

[3] At the top of the first page, the Invoice lists Wiley's name and address and states in small print: "The non-exclusive reproduction rights granted by the payment of this invoice by the Client/Licensee named above are limited to the specific usage, placements and duration as noted below, and are subject to the TERMS AND CONDITIONS set forth on the subsequent pages of this Agreement. This Agreement constitutes the sole and exclusive agreement between Odyssey Productions and the Client/Licensee and shall prevail over any additional or contrary terms and conditions in Licensee's forms, including purchase orders, confirmations, checks, etc., all of which are hereby rejected.  Odyssey Productions is only willing to do business with Client/Licensee on the terms of this Agreement."  (Beasley Decl., Ex. A, Invoice.)

Beasley does not rely on this language or even mention it in his briefs. (It is specifically mentioned in Beasley's Declaration, filed in support of his motion.)  Wiley also fails to address it.  Perhaps this is because it is language typical of a Uniform Commercial Code Article 2 "battle of forms," and Article 2 applies only to sales of goods.  It is doubtful that Article 2 applies to the copyright licensing agreement here because title did not pass to a moveable "thing."  See Lukwinski v. Stone Container Corp., 726 N.E.2d 665, 668-69 (Ill. App. Ct. 2000).  Therefore, we will follow the parties' lead and refrain from engaging in an Article 2-type contract analysis.

I see we have 35 pictures @ 1/4 page, and 2 @ 1/2 Page.
The total for the invoice would come to $7,500.
Please confirm this, and then send me an invoice.
PLEASE include all the info from this excel file on the
invoice (title: Frommer's Chicago Day by Day 1st Edition,
Print Run info, Pub Date, and your Federal ID #-Or Social
Security # if you are not incorporated.)

Also, you can make it one invoice of $7500 for all the
pictures. I'd prefer that for my accounts payable dept.
Send to the address below, to my attention.  FYI: No
purchase order # necessary from me, for interior usage.
. . .

(Second Decl. of Christopher P. Beall, Ex. A.)  The first page of
the "excel file" (a spreadsheet) that was attached to Fox's e-mail
listed information for the 37 images under several columns: "BOOK,"
"FIG #," "SOURCE," "ID#," "PHOTOGRAPHER," "DESCRIPTION," "USAGE,"
"SIZE," "STATUS," "FEE," "DISTRIBUTION," "PRINT RUN," and "PUB.
DATE."  Under the heading "BOOK," each entry stated "CHICAGO DBD";
under the heading "PRINT RUN," each entry stated "46,000 (2
Editions Total)."  (Second Beall Decl., Ex. B.)

At his deposition, Philip testified that he was unable to open
and view the spreadsheet file that was attached to Fox's e-mail and
therefore did not see the attachment's reference to "2 Editions
total." (Johnson Decl., Ex. D, Tr. of Dep. of Jerry Philip, at 47-
48, 56.)  In preparing the Invoice to send to Wiley, Philip relied
on the e-mail and phone discussions he had had with Wiley
representatives, which all involved discussion of licensing rights
for a first edition, with no mention of a second edition.  (Philip
Dep. at 49, 54, 56, 64-65.)

Philip's response to Fox's e-mail was as follows:

Hello Richard,

Robert was negotiating under the impression that the pricing you and he discussed regarding Frommer's Chicago project was for <u>United States distribution</u>, English language only.
The Special Discount Price he offered was based on a premise of a <u>USA (only) distribution</u>.

Odyssey's website posts its Standard Rates for World Rights as being:
Odyssey's World Rights (one edition, one language) are calculated as Current Base Rate + 100%.

Robert agreed to reduce the base rate for <u>USA</u> to ¼ page use to 200, and for ½ page to 250.

A note I have from Matthew Kiernan would seem to indicate that the possible distribution could be "World" . . . not just the USA.
Should I adjust the prices quoted below to reflect world distribution?

Cordially,
Jerry Philip

(Second Beall Decl., Ex. A.)

Fox responded:

Hi Jerry,

I am pasting the original e-mail my assistant Matthew had sent your office.  I have never said "North American" rights, nor did Matthew.

[pasted e-mail]

We are actually going for Limited World rights---less than 10% going abroad to English Language Countries.
The rest of the distribution would be in US and Canada.

That can be written into the invoice as well.  As for pricing, as I mentioned over the phone the rates I wrote below are what I need to go with.

$7500 total is a reasonable compromise in my opinion, per bulk usage.  This is what I had said to Robert last week as well.

I am not prepared to change the fee schedule, so please keep it as I spelled out originally.

1/4 page +[sic] $200
1/2 Page = $250
Full Page = $300

Thanks again.

Richard

(Second Beall Decl., Ex. A.)  The Invoice that Philip prepared and then sent to Wiley reflected this requested "world rights" definition and pricing.

Neither Beasley nor Wiley discusses which of Odyssey's and Wiley's communications constituted an offer or an acceptance, or at exactly which point the license agreement was formed.  We believe that it is not necessary to discuss these details, because the only question raised by Wiley about the scope of the license is whether it permitted Wiley to print editions subsequent to the first. Wiley asserts that because the Invoice does not include any language specifically prohibiting the publishing of editions subsequent to the first, it is "ambiguous with respect to whether a second edition" of Chicago Day by Day that incorporated Beasley's photos was authorized.  (Def.'s Mem. in Opp'n to Pl.'s Mot. at 8.) This argument is unpersuasive.  The Invoice refers to a "Project Title" of "Chicago Day by Day 1."  More importantly, under the heading "Usage Rights Granted," it states "[o]ne time nonexclusive

print rights . . . Frommer's 'Chicago Day by Day' 1st Edition."
There is nothing ambiguous about this language.  It granted Wiley
"one time" rights to print a "1st Edition" of the book.  Moreover,
copyright licenses are "assumed to prohibit any use not
authorized."  <u>S.O.S., Inc. v. Payday, Inc.</u>, 886 F.2d 1081, 1088
(9th Cir. 1989); <u>see also</u> <u>Gilliam v. Am. Broad. Cos.</u>, 538 F.2d 14,
21 (2d Cir. 1976) (concluding that copyright licensee was not
entitled to use licensed material in ways "not specifically
empowered" by the terms of the license).

Even if the Invoice were somehow ambiguous on the issue of the
number of editions that were authorized, the e-mail discussions
between Odyssey and Wiley point to a single interpretation: that
the licensed use was for only one edition.  Wiley has submitted no
evidence that contradicts Philip's testimony that Wiley
representatives never made a request for two editions during their
discussions.  Wiley's contention that it "express[ly] request[ed]"
two editions, Def.'s Mem. in Opp'n to Pl.'s Mot. at 9, is simply
wrong.  The reference to "2 Editions Total" in the spreadsheet
attached to Fox's initial December 19 e-mail to Philip was not an
"express request."  Furthermore, even if that reference could be
construed as a "request," it was contradicted by Fox's words in the
body of that e-mail: Fox used the subject line "Frommer's Chicago
Day by Day 1st Edition," and he also explicitly instructed Odyssey
to include the title "Frommer's Chicago Day by Day 1st Edition" on

the invoice.  When Philip responded that the pricing was for United States distribution only and explained the pricing for "World Rights" for "one edition," Fox then disputed the geographical limitation but did not object to the "one edition" statement or respond that he wanted two editions.[4]  And there was no objection from Wiley when it received the Invoice referring to a "Project Title" of "Chicago Day by Day 1" and granting usage rights for "Frommer's 'Chicago Day by Day' 1st Edition."  Wiley paid the Invoice and then used the photos.

Wiley has failed to produce any evidence that there was not a meeting of the minds between Odyssey and Wiley that the scope of the copyright license would be for one edition only, and it accordingly fails to create an issue of fact as to the scope of the license.  It is undisputed that Wiley printed two editions; therefore, it exceeded the scope of the license.  There is also no dispute that Wiley exceeded the scope of the license by distributing electronic editions of the book.

## 2.  Defendant's "De Minimis" Argument

Wiley contends that "genuine issues of material fact remain as to the quantity and scope of Wiley's alleged overruns."  (Def.'s Mem. in Opp'n to Pl.'s Mot. at 9.)  It does not dispute that it printed 75,938 copies of <u>Chicago Day by Day</u> (total, across the two

---

[4]  Fox also continued to use the "Frommer's Chicago Day by Day 1st Edition" subject line in the e-mail string without modifying it.

editions), but maintains that it actually *distributed* just over 55,000 copies.  Wiley argues that the number of copies that were printed but not distributed are not "germane," and it characterizes the distribution overrun of approximately 9,000 copies as "de minimis" and "not sufficiently substantial to warrant a finding of liability."  Wiley also refers to its its distribution of 58 electronic copies of the book as "trifling."  (Def.'s Mem. in Opp'n to Pl.'s Mot. at 10.)

Wiley displays a rather nonchalant attitude about copyright infringement.  As Beasley correctly points out, his exclusive rights include both reproduction and distribution rights.  Wiley reproduced and distributed *thousands* more copies of the book than the license permitted.  It ignored the "no electronic rights" provision.  Those are not de minimis infringements, or, in Wiley's words, "inconsequential deviations."  (Def.'s Mem. in Opp'n to Pl.'s Mot. at 11.)  The three decisions cited by Wiley in support of its argument are completely inapposite.  See Ringgold v. Black Entm't Television, Inc., 126 F.3d 70 (2d Cir. 1997) (holding that defendant's use of plaintiff's poster of an artistic work as a set decoration for a television program was *not* de minimis); Leviton Mfg. Co. v. Fireman's Fund Ins. Co., 226 F. App'x 671 (9th Cir. 2007) (affirming district court's determination that a building contractor was not liable for breach of contract where it had substantially performed its obligations); Pacini v. Regopoulos, 665

N.E.2d 493 (Ill. App. Ct. 1996) (applying de minimis doctrine to hold that a 94.9953 percent occupancy rate was essentially a 95 percent occupancy rate, thus relieving sellers of their obligations on a shopping-center occupancy guarantee). The "de minimis" argument is rejected.

### 3. <u>Statute of Limitations</u>

Defendant also asserts that genuine factual issues remain as to its statute of limitations defense. It submits that Beasley "was or should have been aware of his copyright infringement claims when Wiley made its worldwide publication of the allegedly infringing e-book versions (and second edition)" of <u>Chicago Day by Day</u>--"all of which occurred well before the limitations period of three years prior to October 31, 2012," the date the complaint was filed. (Def.'s Mem. in Opp'n to Pl.'s Mot. at 11.) An electronic version of the book was issued as early as 2007, and the second edition of the book was published in May 2009.

Under 17 U.S.C. § 507(b), no action for copyright infringement "shall be maintained . . . unless it is commenced within three years after the claim accrued." Wiley contends that an infringement claim for unauthorized publication accrues upon that publication, citing two district court decisions from outside this circuit that applied this "injury rule." It fails to cite the law of this circuit, which uses the "discovery rule" of accrual. In the Seventh Circuit, "the copyright statute of limitations starts

to run when the plaintiff learns, or should as a reasonable person have learned, that the defendant was violating his rights." <u>Gaiman v. McFarlane</u>, 360 F.3d 644, 653 (7th Cir. 2004) (citing <u>Taylor v. Meirick</u>, 712 F.2d 1112, 1117 (7th Cir. 1983)).[5]

Beasley testified at his deposition that he did not learn of any possible infringement by Wiley until November 2011, eleven months prior to filing suit, when Robert Frerck of Odyssey told him that in the course of doing Internet research, he had come across a "prepublication notice" for a printing of the second edition of <u>Chicago Day by Day</u>. (Johnson Decl., Ex. E, Tr. of Dep. of Michael Beasley at 73-74, 78.) The salient question, then, is whether Beasley reasonably should have discovered Wiley's infringement prior to that date, considering that electronic books had been issued in 2007 and the second edition had been published in May 2009. Wiley points to a single piece of evidence particular to this case in an attempt to create a genuine issue: Beasley's

_____

[5]/ The parties have submitted supplemental briefs regarding the Supreme Court's decision in <u>Petrella v. Metro-Goldwyn-Mayer, Inc.</u>, 134 S. Ct. 1962 (May 19, 2014). In <u>Petrella</u>, the Court held that the equitable defense of laches cannot be applied to bar a copyright infringement claim that is brought within the Copyright Act's three-year limitations period. In her prefatory remarks, Justice Ginsburg, writing for the Court, stated that "[a] copyright claim . . . arises or 'accrue[s]' when an infringing act occurs," and then dropped a footnote stating: "Although we have not passed on the question, nine Courts of Appeals have adopted, as an alternative to the incident of injury rule, a 'discovery rule,' which starts the limitations period when 'the plaintiff discovers, or with due diligence should have discovered, the injury that forms the basis for the claim,'" quoting <u>William A. Graham Co. v. Haughey</u>, 568 F.3d 425, 433 (3d Cir. 2009), as well as a copyright treatise. 134 S. Ct. at 1969 & n.4. Wiley suggests that the Supreme Court therefore views the "injury rule" as the correct rule of accrual. That remains to be seen because the Court expressly declined to reach the question. In any event, and until the Supreme Court holds otherwise, this Circuit applies the discovery rule.

testimony regarding his conversation with Frerck.  According to Wiley, "Beasley could not recall when this particular conversation took place."  (Def.'s Mem. in Opp'n to Pl.'s Mot. at 13.)  But Beasley testified that the conversation took place in November 2011.  Wiley makes much of the fact that Beasley stated that he and Frerck discussed a prepublication notice indicating that a second edition was "*going to be published*" (emphasis Wiley's), but there is nothing strange about that.  It is not at all unusual that an Internet search conducted in 2011 would generate an "old" prepublication notice.  It does not follow that the conversation between Beasley and Frerck must have occurred before May 2009, and in any event there is no evidence contradicting Beasley's testimony that the conversation occurred in November 2011.

Wiley also contends that Beasley was on "constructive notice" that his images "may have been infringed" in light of the fact that national media "have been reporting changes in the stock photography business models and potential violations by textbook publishers for years."  (Def.'s Mem. in Opp'n to Pl.'s Mot. at 13-14.)  It submits that Beasley's "failure to investigate years before the complaint" is "inexcusable" and "tantamount to sticking his head in the sand."   (Def.'s Mem. in Opp'n to Pl.'s Mot. at 14.)  We disagree.  News reports and articles about "potential violations" by textbook publishers in general would not provide Beasley with any inkling that Wiley in particular was infringing

his copyrights.  Wiley cites inapposite case law and, again, case law from outside this circuit.  It fails to acknowledge Seventh Circuit law indicating that copyright holders have no general duty to troll for infringements.  See Taylor, 712 F.2d at 1118 ("[W]e doubt that every time the sales of a publication dip, the publisher must, to preserve his right to sue for copyright infringement, examine all of his competitors' publications to make sure none is infringing any of his copyrights."); Gaiman, 360 F.3d at 654 ("[U]nless there is a duty of authors to read the copyright pages of works containing their copyrighted materials--and there is not-- . . . the notice can affect the accrual of the cause of action only if the victim reads it."); see also William A. Graham Co. v. Haughey, 568 F.3d 425, 438-39 (3d Cir. 2009) (rejecting "the proposition that a copyright owner has a duty to investigate infringement 'in the offing'" and stating that a copyright owner "does not have a duty to ferret out potential acts of infringement before they occur").

Wiley has submitted no evidence to create a genuine issue of material fact as to whether Beasley should have discovered Wiley's infringement at an earlier time.

Plaintiff's motion for summary judgment of liability for copyright infringement will be granted.

**B.  Defendant's Motion for Summary Judgment on Counts II and III**

Wiley moves for summary judgment on Counts II and III, plaintiff's claims for, respectively, common-law fraud and violation of the Digital Millennium Copyright Act.  In response to Wiley's motion, Beasley states that he "does not oppose" Wiley's motion and "[i]nstead . . . asks that he be granted leave to withdraw" Counts II and III by way of an amended complaint that omits those claims.  (Pl.'s Resp. to Def's Mot. for Partial Summ. J. at 2.)  Wiley opposes this request, arguing that we should simply enter judgment because it would be unduly prejudiced if plaintiff were permitted to withdraw the claims.  Wiley points out that it "expended significant resources to fully brief and submit its motion for summary judgment, which was direct[ed] solely to the DMCA and fraud claims."  (Def.'s Reply at 3.)  It also notes that a judgment in its favor on the DMCA claim would potentially entitle it to recover attorneys' fees.  See 17 U.S.C. § 1203(a), (b)(5) ("In an action brought [for violation of 17 U.S.C. § 1201 or 1202], the court in its discretion may award reasonable attorney's fees to the prevailing party.").

Any withdrawal or dismissal of Counts II and III will be with prejudice.  We have no view as to whether fees should be awarded, but Wiley is entitled to request them.  Therefore, we will not allow plaintiff to withdraw or dismiss Count III without considering whether the defendant is entitled to a fee award on

that claim.  The case will be set for a status hearing on July 30, 2014 at 11:00 a.m. to discuss how the parties wish to proceed on this issue.

**C.    Plaintiff's Motion to Challenge**
       **Defendant's Confidentiality Designations**

In support of his summary judgment motion, plaintiff filed data reports Wiley produced in the course of discovery.   The reports show the print totals and revenues for <u>Chicago Day by Day</u>, along with a summary chart prepared by plaintiff that shows print totals.  (Decl. of Alex Rice Kerr, Exs. 1-4.)  Wiley designated those materials as confidential.   Plaintiff has moved to provisionally file these exhibits to his motion and for leave to file the unredacted version of his motion, and he challenges Wiley's "confidential" designations and contends that the exhibits should be publicly filed.   In response, Wiley withdraws its confidentiality designations for each of these exhibits and agrees with plaintiff that they should be publicly filed.   Accordingly, plaintiff's motion is denied as moot.   Plaintiff may file an unredacted version of his summary judgment motion that incorporates a  public filing of Exhibits 1 through 4 to Kerr's Declaration.

## CONCLUSION

Plaintiff's motion for summary judgment of liability on Count I [42, 43] is granted.  Plaintiff's motion to challenge defendant's confidentiality designations, for leave to file the unredacted

version of his summary judgment motion, and to publicly file
Exhibits 1 through 4 to the Declaration of Alex Rice Kerr [47] is
denied as moot.  Defendant's motion for summary judgment on Counts
II and III [44] is entered and continued, and a status hearing is
set for July 30, 2014 at 11:00 a.m. to discuss how the parties wish
to proceed as to that motion.


DATE:        July 21, 2014


ENTER:       _____

             John F. Grady, United States District Judge